**NICHOLS CHAROLAIS RANCH, INC., Perry Nichols, Inez Nichols and Perry Nichols, Jr., Plaintiffs,**

v.

**Gerald C. BARTON, Defendant.**

**Gerald C. BARTON, Plaintiff,**

v.

**NICHOLS CHAROLAIS RANCH, INC., Perry Nichols, Inez Nichols and Perry Nichols, Jr., Defendants.**

**Nos. 75–11–Civ–Ft.M–Y, 75–17–Civ–Ft.M–Y.**

United States District Court, M. D. Florida, Fort Myers Division.

Sept. 18, 1975.

Fletcher Brown, Arcadia, Fla., for Nichols Charolais Ranch, etc.

Robert W. Smith, Orlando, Fla., for Gerald C. Barton.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Chief Judge.

The facts of both cases numbered 75–11 and 75–17 Fort Myers-Civil arise from similar transactions involving substantially the same parties and involve certainly the same basic principles of law so that it is appropriate to consolidate them. The motion to consolidate will be granted.

After careful consideration of the pleadings, affidavits, depositions and the entire file of this case, it appears that there are certain material facts which are uncontradicted and upon which there is no genuine issue.

Undisputed are the following facts: Sometime prior to 1972, the plaintiff Gerald C. Barton (Barton), a lawyer, associated with the defendant, Perry Nichols, Sr., (Nichols), also a lawyer, in the representation of a joint client, in a lawsuit in the State of Florida. As a result, they struck up a close friendly relationship; the plaintiff Barton visited the defendant Nichols at a ranch owned and operated by Nichols. Barton became interested in Charolais cattle being raised on the ranch by Nichols. At the request of Barton, the defendant Nichols sent to Barton a copy of a maintenance agreement which he had with his son for the maintenance of cattle on a flat fee basis. In February, 1972, Barton purchased some Charolais cattle of varying degrees of pure breed from the Nichols Charolais Ranch, Inc., (Ranch), a corporation, and entered into a separate maintenance agreement at a flat fee of $250 per year for each cow and for each calf which was weaned.

The agreement also provided that Barton had full ownership of the cattle and that any losses would be sustained by him; that in return for the flat fee of $250 per head, the defendant's Ranch would pay for the fertilizing of a certain specified number of acres—(approximately 80 acres) and would provide all veterinary treatment, medicines, and working of the cattle as required.

Again, on August 17, 1973, an additional amount of cattle was purchased by Barton from Ranch. This was nearly a year and a half after the first purchase. The second purchase was in two separate acquisitions on the same day; some of the cattle were purchased from the Ranch, a corporation, and the others were purchased from Perry Nichols, Jr., son of Nichols.

In each instance, both in 1972 and in 1973, promissory notes were given for the unpaid balances, after the down payments

in cash. When the promissory notes payments were not made, Ranch brought suit against Barton in the State Court of Florida which was removed to the federal court by Barton in Case No. 75–11–Civ–Ft.M. involved the notes given for the 1973 purchase.

Barton is a lawyer of considerable experience in investments. His net worth at the time of taking his deposition was in excess of $1,000,000.

Subsequent to the purchase of these cattle by the plaintiff, he came to the Nichols Ranch frequently, participating in the agreement of what was to be done with his cattle. He sold some of the cattle on his own notifying Nichols that he had sold them and directed Nichols to take the cattle to Ocala to be delivered to the auction. He also acquired his own additional cattle, bulls and semen and directed what was to be done with them. He secured from the Department of Agriculture in Tallahassee his own brand which was GB and directed the Nichols Ranch to brand all of his cattle with it.

The cattle, incidentally, were kept in a separate herd with no commingling of either the cattle or the monies that were derived from the sale of the calves that dropped from the cows.

The type of maintenance contract which was entered into between the Ranch and the plaintiff Barton in this case was used in a total of seven transactions of which one was with Barton, another was with the son of Perry Nichols, Sr., and five with five other individuals. There was no solicitation of Barton to secure his acquisition of these cattle. Barton owned the cattle outright. He had full control over what was to be done with them in the maintenance of the cattle by the Nichols Ranch, which was subject to cessation at any time on 90 days notice, and as previously noted was for a flat fee per head, $250 under the first contract per year and $400 per head under the second contract.

In 1974 the price of cattle dropped precipitously while the cost of raising cattle increased tremendously. So in December of 1974 the plaintiff Barton wrote a letter to the Nichols Ranch in which he stated that he no longer could maintain the domestic type cattle on a basis of $400 per head. He further stated that he would have to take them from the Ranch and make other arrangements.

He also said in that same letter that he was making no complaints about the reasonableness of the charge in view of the fact of his understanding of the high cost of fertilizer and the other factors that go into maintenance of cattle. He directed that his cattle herd be ready to be removed by truck on the 31st of December 1974. So, at the end of 1974, almost two years after the purchase which is now challenged there was no complaint. Apparently, the first claim for violation of the Securities Act arose when there was an effort to collect on the note.

■ Defendants' contention that the claim against Perry Nichols, Jr., is barred by res judicata, because of a decision against Barton in a state case, is premature for decision on that point because that case is on appeal. As counsel for Barton has correctly pointed out, if that case were to be reversed by the state appellate court, any decision made by this court predicated on a theory that the result in the state trial court was conclusive in this federal court would automatically be vacated.

As to the defendants' claims that certain of the individuals have no interest and therefore are not proper parties, and that the actions as to the 1972 contract are barred by the statute of limitations, it is unnecessary to decide those issues because of the decision to be made here on the primary issue; that is, whether or not these sales and the accompanying maintenance contract constituted sales of securities within the Federal Securities Act involved in this case.

I am familiar, of course, with the *Howey* case,[1] the *Black Watch* case [2] and the other cases that are cited by counsel for Barton. While certain principles that are in those cases could be lifted out from the text of each case and said to apply to this case, to do so would be plucking out of context the principles cited. The facts in this case which are undisputed and therefore are those to which the principles of law should be applied are quite different from the *Howey* case, *Black Watch* case, the *Koscot* case,[3] the *Dairy* case [4] and the other cases that have been cited by counsel. Those cases involved widespread solicitation where the purchasers of what was found to be securities were depending for a profit solely on the activities of the promoter.

 Now, this court recognizes and, of course, adheres to the principle enunciated by the Fifth Circuit in the *Koscot* case, that the word "solely" is not to be strictly construed, so that any participation by the investor does not necessarily remove him from the protection of the Securities Act. But that is not the situation on the undisputed facts of this case.

Barton, a knowledgeable investor in 1972, purchased cattle and not only had the right to exercise control over what was done with the cattle, but he did in fact exercise considerable control.

Apparently he did not actually conduct the artificial insemination himself or personally apply the branding iron. Nor did he, perhaps, feed the cattle himself, or administer the worming medicines, but he did on occasion exercise control over what was to be done with these cattle.[5] Also, Barton acquired purebred heifers from people other than the Ranch after he had his herd.

If this case were to have reached the point where all of this evidence had been submitted to a jury, and a motion for directed verdict was pending, this court would have to grant the motion. Also, if on this undisputed evidence now before the court a jury had brought in a verdict in favor of the plaintiff Barton, this court would have to grant a judgment in favor of defendants notwithstanding the verdict.

 Accordingly, this court must deny the motion for summary judgment by Barton and grant the motion for summary judgment by the defendants.

(The above is a transcript of the ruling from the bench on September 18, 1975 with syntax corrected and citations added).

1. *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

2. *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154 (S.D.N.Y.1974).

3. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974).

4. American Dairy Leasing Corp., C.C.H. Fed. Securities Law Reports, Paragraph 78, 584.

5. It was not like the orange grove in the *Howey* case, where the oranges were just there. An orange grove operation is quite different from a cattle operation, as there is not much day to day control that can be exercised over orange crops other than to decide how much fertilizer and how much pesticide spray is to be put on the trees, how often the ground is going to be cut underneath the trees, and when the crop is going to be picked.