Jim LONG, et al., Plaintiffs–Appellants,

v.

SHULTZ CATTLE COMPANY, INCOR-
PORATED, an Oklahoma Corporation,
and William B. Shultz, Defendants–Ap-
pellees.

No. 88–1169.

United States Court of Appeals,
Fifth Circuit.

Aug. 9, 1989.

**130**

Michael G. O'Neill, Lisa M. Williams, Hamilton & O'Neill, Dallas, Tex., for plaintiffs-appellants.

John D. Luken, Paul R. Mattingly, Cincinnati, Ohio, for defendants-appellees.

Before KING, WILLIAMS and SMITH, Circuit Judges.

KING, Circuit Judge:

Plaintiffs-appellants appeal from the judgment of the district court that defendants-appellees' cattle-feeding consulting agreements were not investment contracts and were therefore not subject to federal securities regulation. For the reasons set forth below, we reverse the judgment of the district court.

I.

A. Facts

In August and September of 1982, plaintiffs-appellants Jim Long, Jerome Atchley, and Jon and Linda Coleman (collectively, "plaintiffs") became involved in a cattle-feeding program advertised by defendants-appellees Shultz Cattle Company, Inc. ("SCCI"). Plaintiffs Long, Atchley, and Jon Coleman are all successful business persons in the radio and television industry.

Plaintiffs first learned of SCCI's program through an advertisement SCCI had placed in the *Wall Street Journal,* announcing a "10 to 1 write-off potential for 1983"—the ad made no reference to the nature of the underlying venture. Plaintiffs contacted SCCI through their investment adviser Donald Alt ("Alt"). SCCI's more detailed promotional literature explained how investors could defer income through cattle feeding with a minimal risk of loss. The literature contained biographical information on SCCI personnel, touting Bill Shultz' twenty-five years of experience as a cattleman, as an attorney with expertise in tax law, and as a member of the Chicago Mercantile Exchange. Arthur and Zachary Shultz, sons of William Shultz, were also advertised as having substantial experience in the cattle business and in the commodities market.

Plaintiffs initially subscribed to a publicly-offered cattle feeding partnership program which SCCI managed as the general partner with individual investors as limited partners. Under this program, SCCI performed all management functions for a fee of $17.50 per head of cattle. Plaintiffs switched, however, to SCCI's individual feeding program after a meeting with Bill Shultz in which Shultz informed plaintiffs that SCCI was having difficulty obtaining approval of its partnership program from the Texas Securities Commissioner. Shultz also told plaintiffs that the individual feeding program would be better suited to their tax needs because they would be able to take greater deductions as "farmers" managing their own business. SCCI subsequently withdrew its application for approval in Texas.

Under the individual feeding program, investors would sign a "consulting agreement" whereby SCCI agreed to provide advice regarding the purchase, feeding,

and sale of the investor's cattle. The investment benefits of SCCI's program stem from the availability of cash-method accounting to "farmers." The program enables investors to deduct pre-paid feed and other costs associated with raising cattle as business expenses, thus deferring income until the following year for tax purposes. SCCI would determine the number of cattle an individual client needed to purchase according to the amount of income the client wanted to shelter. Based on the amount of grain consumed per head of cattle and the price of grain, SCCI would calculate the number of cattle needed to consume the quantity of grain that would give investors the desired deductions.

Because the tax laws had been revised to provide that investors must participate actively in "farming" in order to employ the cash method of accounting, SCCI's prospectus, incorporated by reference into the consulting agreement, required each investor to represent that "by experience, education or other means [the investor] is or has become knowledgeable about the cattle feeding business and that he will exert substantial and significant control over, and will, exercising independent judgment, make all principal and significant management decisions concerning his cattle feeding operations."

SCCI's promotional materials emphasized that investors could be "at risk" for tax purposes but eliminate any real risk of loss by "hedging" their cattle—buying futures on the commodities market or entering forward sale contracts—to lock in a price and minimize the clients' potential profits or losses. SCCI arranged for such transactions to be conducted through the Rosenthal commodities brokerage firm of which SCCI was a branch office. SCCI also made arrangements with a select number of financial institutions and feed yards to provide the services required by its clients.

Other than the 60% commission which SCCI received on the one dollar per head fee paid to Rosenthal on hedging transac-

tions, SCCI received only a flat-rate consulting fee of $20 per head for these services and received no share of its clients' profits.

Plaintiffs' cattle were fed, along with those of many other SCCI clients, at the McElhaney feedyard in Yuma, Arizona. The McElhaney feedyard maintained large pens in which the cattle owned by various clients were commingled. The cattle were tagged only by pen number and not by individual investor. Each investor was therefore considered to own a percentage of the total pounds of cattle in the pen. If any cattle died, the loss was not attributed to a single investor/owner, but was distributed on a pro rata basis among the investors.

During the first year of the program—1982/83, plaintiffs hedged all of their cattle and lost half of the money they had provided up-front. Plaintiffs testified that this result was consistent with SCCI's predictions and that they had no complaints about the first year of the program. Plaintiffs elected to continue in the feeding program for a second year—this time with less satisfactory results. Based on predictions that beef prices were on the rise, plaintiffs decided to hedge only half of their 1450 head of cattle in the second year. Beef prices declined substantially instead of increasing, and a strike involving Arizona meatpackers required that cattle at the McElhaney feedyard be transported to Missouri for sale at an additional cost of $15 per head. Plaintiffs lost a total of over $100,000 and subsequently filed this lawsuit against SCCI in 1984, alleging that SCCI sold unregistered securities in the form of the consulting agreements and had committed fraud in connection with those transactions in violation of the Securities Act of 1933, 15 U.S.C. § 77l and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j.[1]

## B. The Trial

The case was tried to a jury in the Federal District Court for the Northern District

---

1. Plaintiffs also alleged violations of the Texas and Arkansas securities laws as well as common law fraud. The only issue on appeal, however, is whether the consulting agreements were investment contracts under federal law.

of Texas in October of 1987. At the close of evidence, plaintiffs moved for a directed verdict instructing the jury to find that the consulting agreements at issue were, as a matter of law, investment contracts subject to federal securities regulations. The district court denied the motion, and the jury found that the agreements were not investment contracts. The jury therefore did not reach plaintiffs' claims of securities fraud. Following the return of the verdict, plaintiffs moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The district court denied both motions and entered a judgment on the jury verdict. Plaintiffs timely filed a notice of appeal.

## C. Issue on Appeal

The sole issue on appeal is whether the district court erred in failing to direct a verdict or grant a j.n.o.v. holding that the consulting agreements were investment contracts as a matter of law.

## D. Standard of Review

We apply the same standard of review to the denial of a motion for a directed verdict and to the denial of a motion for a judgment n.o.v. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc); 9 C. Wright & A. Miller, *Federal Practice & Procedure* §§ 2524, 2537 (1971 & Supp. 1988). We may reverse the judgment of the district court only if we determine that there was no conflict in substantial evidence sufficient to create a question of fact for the jury. *Boeing*, 411 F.2d at 375. In other words, we may reverse the district court only if we conclude, on the entire record construed in the light most favorable to the nonmoving party, that the evidence is so overwhelmingly in favor of the moving party that no reasonable jury could have arrived at the disputed verdict. *Id.* at 374; *see also Knight v. Texaco, Inc.*, 786 F.2d 1296, 1298 (5th Cir.1986).

The decision whether to grant a new trial is, on the other hand, within the discretion of the district court and may be granted even if the moving party is not entitled to judgment as a matter of law. *See* 9 C. Wright & A. Miller, *supra*, § 2539.

We find, however, that plaintiffs were entitled to a judgment, as a matter of law, on the investment contract question, for the record reveals that there was no *disputed* question of fact which, even if resolved in favor of SCCI, would support the conclusion that the consulting agreements at issue in this case were not investment contracts. We therefore find that the district court erred in refusing to enter a judgment notwithstanding the verdict.

## II.

The Securities Act of 1933 and the Securities Exchange Act of 1934 include "investment contracts" within the definition of "securities" subject to the Acts. 15 U.S.C. §§ 77b(1), 78c(a)(10). In *Securities & Exchange Commission v. W.J. Howey Co.*, the Supreme Court held that to determine whether a contract, transaction or scheme is an investment contract for purposes of the Securities Acts "[t]he test is whether the scheme involves [1] an investment of money in [2] a common enterprise [3] with profits to come solely from the efforts of others." 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946); *accord Marine Bank v. Weaver*, 455 U.S. 551, 559, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982); *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 795–796, 58 L.Ed.2d 808 (1979); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct.2051, 2060, 44 L.Ed.2d 621 (1975). The parties do not dispute that the first prong of the *Howey* test is satisfied in this case. Only the latter two elements—whether the cattle-feeding scheme at issue here was a "common enterprise" and whether plaintiffs expected profits [2] "solely from the efforts of

---

**2.** The inducement of tax benefits such as those offered by SCCI's program may constitute an expectation of "profits" under the *Howey* test. *Securities & Exchange Comm'n v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 464 (9th Cir.1985); *Securities & Exchange Comm'n v. Aqua–Sonic Products Corp.*, 687 F.2d 577, 583 (2d Cir.), *cert. denied sub nom., Hecht v. Securities & Exchange Comm'n*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982); *see also Good-*

others"—are contested. Because the controversy centers primarily on the third prong of the *Howey* test, we will discuss that issue first.

## A. Solely From the Efforts of Others

■ It is axiomatic in federal securities law that in order to give effect to the remedial purposes of the Acts, substantive "economic realities" must govern over form. *See Daniel,* 439 U.S. at 558, 99 S.Ct. at 796; *Forman,* 421 U.S. at 848, 95 S.Ct. at 2058; *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Williamson v. Tucker,* 645 F.2d 404, 418 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). Consequently, in order to ensure that the securities laws are not easily circumvented by agreements requiring a "modicum of effort" on the part of investors, the word "solely" in the third prong of the *Howey* test has not been construed literally. *Securities & Exchange Comm'n v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *Securities & Exchange Comm'n v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 480 (5th Cir.1974); *Williamson,* 645 F.2d at 418; *Securities & Exchange Comm'n v. Aqua–Sonic Products Corp.,* 687 F.2d 577, 582 (2d Cir.), *cert. denied sub nom. Hecht v. Securities & Exchange Comm'n,* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). The "critical inquiry" is instead "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson,* 645 F.2d at 418; *Koscot,* 497 F.2d at 483 (quoting *Glenn W. Turner Enterprises,* 474 F.2d at 482).

Plaintiffs contend that the representations contained in the consulting agreements, emphasizing the investor's active role in the feeding program, were merely "window dressing," designed to comply with IRS regulations. Plaintiffs argue that in reality they were wholly dependent upon the expertise of SCCI and that SCCI, not plaintiffs, exerted the "essential managerial efforts" that determined the failure or success of the cattle-feeding enterprise. SCCI, on the other hand, argues that plaintiffs had the power under the agreement to make all essential managerial decisions and in fact exercised that power.

In *Williamson, supra,* we held that an investor's formal power to make managerial decisions did not automatically preclude a finding that the investor relied solely on the efforts of others. Rather, consistent with the principle that substance must govern over form, we held that even where an investor formally possesses substantial powers, the third prong of the *Howey* test may be met if the investor demonstrates that he "is so inexperienced and unknowledgeable" in the field of business at issue that he "is incapable of intelligently exercising" the rights he formally

*man v. Epstein,* 582 F.2d 388, 407 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) (possibility of tax benefits from initial losses did not detract from expectation of eventual profits). We note, moreover, that SCCI's promotional materials emphasized the potential for profits as well as tax benefits—although SCCI also stressed that clients could limit their risks by locking in a price for their cattle that would minimize the potential for both profits and losses. It is clear in any event that SCCI's clients were drawn by the prospect of a return on their investment—whether that return was in the form of tax benefits or profits.

Although SCCI does not dispute this point, we note that *Forman* does not preclude a finding that tax benefits may constitute an expectation of profits. *See Goldfield Mines,* 758 F.2d at 464 n. 2. Although the Court held in *Forman* that the deductibility of interest on a mortgage did not constitute "profits," the Court carefully noted that "[e]ven if these tax deductions were considered profits, they would not be the type associated with a security investment since they do not result from the managerial efforts of others." 421 U.S. at 855 & n. 20, 95 S.Ct. at 2062 & n. 20. The Court found that the investors in *Forman* simply "sought to obtain a decent home at an attractive price," *id.* at 860, 95 S.Ct. at 2064,—with the tax benefits available to "any homeowner who pays interest on his mortgage." *Id.* at 855, 95 S.Ct. at 2062.

The tax benefits offered by SCCI's program are clearly distinguishable from those in *Forman* because, as we hold below, SCCI's clients were drawn by the prospect of gaining significant tax benefits through the efforts of others.

possessed under the agreement.[3] 645 F.2d at 424; *accord Sparks v. Baxter,* 854 F.2d 110, 114 (5th Cir.1988); *Youmans v. Simon,* 791 F.2d 341, 346 (5th Cir.1986). Thus, under *Williamson,* a plaintiff may establish reliance on others within the meaning of *Howey* if he can demonstrate not simply that he did not exercise the powers he possessed, but that he was incapable of doing so.

While the district court properly instructed the jury in accordance with the principles announced in *Williamson,* we find that the undisputed evidence presented to the jury established, as a matter of law, that plaintiffs entered the consulting agreements with an expectation of profits to be derived solely from the efforts of SCCI. A careful examination of the record reveals that the only possible basis for the jury's verdict was the evidence that plaintiffs themselves made the decision in 1983 to leave half of their cattle unhedged. We conclude, however, that that evidence is not sufficient, as a matter of law, to support the jury's verdict. Applying the standard set forth in *Williamson,* we turn first to the plaintiffs' powers under the consulting agreement.

1. *The Clients' Powers Under the Agreement*

There is no dispute that plaintiffs had a substantial degree of theoretical control over their investment. They could, theoretically, move their cattle to a different

feedyard, decide what to feed them, provide their own veterinary care, or seek buyers on their own. Moreover, SCCI argues, its clients were *required* to authorize every management decision involving their cattle. Although Long, Atchley, Coleman, and Alt testified that they frequently were notified of SCCI's decisions only after the fact, we need not second-guess the jury's resolution of this credibility dispute for even if the plaintiffs *did* approve the decisions in advance, the evidence is undisputed that at each juncture plaintiffs relied solely on the advice of SCCI:[4] Plaintiffs followed SCCI's recommendations regarding the purchase of cattle, the choice of a feedyard, the choice of a financial institution to provide financing,[5] the choice of a commodities broker, the decision when to sell, and the decision to whom to sell.

With the exception of the hedging decision, which we discuss in detail below, the evidence was undisputed that plaintiffs did not exercise their power to make independent management decisions but relied instead on the managerial efforts of SCCI. We therefore turn next to the question of plaintiffs' ability to exercise those powers.

2. *Plaintiffs' Expertise in the Cattle Business*

While it is not disputed that plaintiffs are successful business people, *Howey* itself establishes that an investor's generalized business experience does not preclude a finding that the investor lacked the knowl-

---

**3.** The test stated in *Williamson, Sparks,* and *Youmans, supra,* refers to the investor's experience in "business affairs," without referring to specialized knowledge. In *Williamson,* however, our discussion made clear that the knowledge inquiry must be tied to the nature of the underlying venture. 645 F.2d at 423. In finding that the general partners in *Williamson* possessed the experience and expertise necessary to exercise their partnership powers, we emphasized the partners' prior experience in similar real estate ventures. *Id.* at 425. Similarly, in *Sparks,* we found that the investors had prior experience in the oil industry and concluded that they were capable of exercising their powers in a joint venture involving oil and gas properties. 854 F.2d at 114. Although the discussion in *Youmans* is less clear on this point, we do not construe that case to be inconsistent with our analysis in *Williamson* which clearly

requires that the investors' knowledge and experience be evaluated with reference to the nature of the underlying venture. Moreover, as we explain more fully below, any holding to the contrary would be inconsistent with *Howey* itself.

**4.** SCCI emphasized at trial that plaintiffs had looked into a similar plan offered by promoters in Houston. This evidence, however, related only to plaintiffs' initial decision to select SCCI. There was no evidence whatsoever that plaintiffs consulted other experts in the cattle-feeding field before making the "decisions" required by Schultz.

**5.** Although plaintiffs obtained letters of credit from their own banks, they did so as part of a financing package that SCCI had arranged for its clients at an Arizona institution.

edge or ability to exercise meaningful control over the venture. Rather, the investors' expertise must be considered in relation to the nature of the underlying venture. *See supra* note 3. In *Howey,* the Court noted that the investors were "business and professional people," 328 U.S. at 296, 66 S.Ct. at 1102, but focused on the fact that the investors were "persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products." *Id.* at 299–300, 66 S.Ct. at 1103–1104.

Similarly, the evidence presented at trial in this case established that the plaintiffs, who lived in places far removed from their cattle, lacked the experience necessary to care for, feed, and market their cattle. Although Long and Alt visited the feedyard on one occasion, there was no evidence that plaintiffs sought to give any individual instruction regarding the care and feeding of their cattle. Plaintiffs' general lack of sophistication in this area was perhaps best illustrated by Alt's deposition testimony, read at trial, in which he expressed the mistaken impression that a heifer was a breed of cattle.

SCCI does not dispute that plaintiffs, like most of SCCI's other clients, were not knowledgeable about the cattle business at the outset of their participation in the program. Indeed, the Shultzes acknowledged that SCCI advertised its feeding program in financial publications such as the *Wall Street Journal* and *Barrons* magazine and in large-city newspapers such as the *New York Times* and *Los Angeles Times* and did not advertise in agricultural periodicals or in other publications likely to have a readership acquainted with cattle-feeding. The Shultzes conceded that the aim of the advertisements, which did not mention cattle feeding, was to attract a large number of inquiries from individuals interested in sheltering their income—without regard to their actual knowledge of the cattle-feeding business.

In contending that the third prong of the *Howey* test is nevertheless not satisfied, SCCI relies on the theory that the cattle feeding business does not, in fact, require a great deal of specialized knowledge but rather depends upon a finite number of "macroeconomic" or "big picture" decisions. SCCI maintains, in effect, that it does not matter that their clients do not know the difference between a steer and a heifer or have the knowledge necessary personally to care for and feed their cattle for such knowledge relates only to the "ministerial" tasks involved in the cattle-feeding business.

█ SCCI maintains that the knowledge actually necessary to make the "meaningful" management decisions in the cattle-feeding business is a question of fact for the jury and that we are therefore bound not to disturb the jury's verdict. There is, however, one crucial flaw in SCCI's theory: SCCI does not dispute that its clients acquire *from SCCI* all of the knowledge necessary to "actively manage" their "individual" cattle-feeding businesses. SCCI's function is to provide its clients with "recommendations" regarding every one of the "handful" of essential management decisions it has identified.[6] SCCI contends, in other words, that investors may become knowledgeable within the meaning of *Howey* through the educative efforts of the promoters. We do not believe that the securities laws may be avoided so easily.

Although we noted in *Williamson* that an investor's access to information may provide the investor with the means necessary to protect himself from dependence on a particular manager or promoter, 645 F.2d at 424, that discussion posited an investor with sufficient business expertise in the relevant area to exercise his powers meaningfully. Access to information does *not* necessarily protect an investor from com-

---

**6.** SCCI further asserts that plaintiffs had adequate experience in the cattle-feeding business by the time of their second year in the program because they had already participated in the feeding program for one year. No evidence was presented, however, to contradict plaintiffs' evidence that their experience during the first year consisted of nothing more than rubber-stamping SCCI's recommendations.

plete dependence on a third party where, as here, that same third party is the sole source of information and advice regarding the underlying venture and the investor does not have the expertise necessary to make the essential management decisions himself.

SCCI hopes, in effect, to avoid the securities laws by simply attaching the label "consulting agreement" to a package of services which otherwise would clearly be an investment contract. Remarking on this same point, the Massachusetts Securities Division was moved to make the following observation about SCCI's "consulting agreements":

> The Shultz agreements and materials in attempting to characterize the arrangements as a "consulting service" and not a security are reminiscent of the assertions of Humpty Dumpty in a conversation with Alice in *Through the Looking Glass:*
>
> > "But 'glory' doesn't mean a 'nice knock-down argument,' " Alice objected.
> >
> > "When *I* use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."
> >
> > "The question is," said Alice, "whether you *can* make words mean so many different things."
> >
> > "The question is," said Humpty Dumpty, "which is to be master—that's all."

\* \* \* \* \* \*

"That is a great deal to make one word mean," Alice said in a thoughtful tone.

"When I make a word do a lot of work like that," said Humpty Dumpty, "I always pay it extra."

Here, too, Shultz has paid its "consulting services" extra—over $3,000,000 in 1982. Blue Sky L.Rep. (CCH) ¶ 31,605 at 26,609 (General Counsel's Opinion Letter Dec. 12, 1983). We agree that the label "consulting agreement" cannot bear the meaning SCCI has given it. The evidence presented at trial established that even if SCCI's clients technically made the key management decisions, they simply rubber-stamped SCCI's recommendations and relied entirely on SCCI's efforts and expertise to manage the underlying venture. Indeed, SCCI's "individual" cattle-feeding program differs only in form from its publicly-offered limited partnerships.[7] Although clients in the individual program technically were required to make their own decisions, SCCI performed for them—*at a higher cost*—all of the services it performed for the limited partners in its other program. It is, in short, impossible to conclude that the third prong of *Howey* is not satisfied without ignoring entirely the economic realities of SCCI's program.

### 3. *The Hedging Decision*

■ In order to defeat the plaintiffs' contention that the consulting agreements were mere window dressing, intended to obscure the clients' complete dependence on SCCI, SCCI focused heavily at trial on the 1983–84 hedging decision which caused

---

7. The SCCI program is, in many respects, a variation on a popular theme. *See, e.g., Babst v. Morgan Keegan & Co.,* 1987 U.S.Dist. Lexis 7165, 1987 WL 15322, (E.D.La. Aug. 6, 1987) (cattle-feeding program was investment contract); *Waterman v. Alta Verde Indus., Inc.,* 643 F.Supp. 797 (E.D.N.C.1986), *aff'd mem.,* 833 F.2d 1006 (4th Cir.1987) (cattle-feeding program was investment contract); *McLish v. Harris Farms, Inc.,* 507 F.Supp. 1075 (E.D.Cal.1980) (cattle-feeding program was investment contract); *Barry v. Ceres Land Co., Inc.,* Fed. Sec. L. Rep. ¶ 99,008 (D.Minn.1978) (cattle-feeding program was investment contract); *Plunkett v. Francisco,* 430 F.Supp. 235 (N.D.Ga.1977) (cattle lease and calf maintenance program was investment contract); *Boone v. GLS Livestock Mgmt., Inc.,* Fed.

Sec. L. Rep. ¶ 97,174 (D.Utah 1976) (cattle breeding and feeding program was investment contract); *see also Continental Mktg. Corp. v. Securities & Exchange Comm'n,* 387 F.2d 466 (10th Cir.1967), *cert. denied,* 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968) (beaver breeding program was investment contract); *Miller v. Central Chinchilla Group, Inc.,* 494 F.2d 414 (8th Cir.1974) (chinchilla breeding program was investment contract). *Compare Nichols Charolais Ranch, Inc. v. Barton,* 460 F.Supp. 228 (M.D.Fla. 1975), *aff'd,* 587 F.2d 809 (5th Cir.1979) (cattle-feeding contract was not investment contract where contract was not part of larger program and investor actively managed his cattle business).

plaintiffs to lose a substantial sum of money and provided the impetus for this lawsuit. Although plaintiffs attempted to prove at trial that SCCI induced them not to hedge their cattle by representing that there would be a "bull market" in beef prices, SCCI presented contradictory evidence that plaintiffs decided independently of SCCI that they would like to realize a profit on their investment. Moreover, Alt's deposition testimony, read at trial, stated that Art Shultz had presented him with a range of possibilities from hedging none of the plaintiffs' cattle to hedging some portion of them. Based on this evidence, the jury could therefore have concluded that plaintiffs voluntarily assumed the risk of hedging only half of their cattle.

As a matter of law, however, this evidence is not sufficient to support the jury's finding that the consulting agreements were not investment contracts. Although plaintiffs' decision to hedge only half of their cattle was "undeniably significant" in terms of the risks to which plaintiffs were exposed, it does not alter the essential character of the SCCI scheme. While *Koscot* speaks of those decisions which "affect the failure or success of the enterprise," failure or success does not refer solely to profits but also to the essential infrastructure of the venture. An investor may authorize the assumption of particular risks that would create the possibility of greater profits or losses but still depend on a third party for all of the essential managerial efforts without which the risk could not pay off.

In *Koscot,* we noted, with respect to the second prong of *Howey,* that "the fact that an investor's return is independent of that of other investors is not decisive." 497 F.2d at 479. In the pyramid scheme involved in *Koscot,* an individual investor's ability to realize a profit depended in part on that investor's ability to bring others into the plan. In discussing whether this factor would preclude a finding of reliance on others within the meaning of *Howey,* we emphasized that even though the efforts of individual investors were relevant to the profitability of their investment, Koscot provided the entire framework within which an individual investor's efforts would succeed or fail: "Without the scenario created by the Opportunity Meetings and Go–Tours, an investor would invariably be powerless to realize *any* return on his investment." *Id.* at 485 (emphasis added); *see also Cameron v. Outdoor Resorts of America, Inc.,* 608 F.2d 187, 193 (5th Cir. 1979), *modified on other grounds,* 611 F.2d 105 (5th Cir.1980) (key issue is whether the managerial efforts of the promoter are "functionally essential" to the success of the enterprise).

Similarly, SCCI provided the entire framework—the cattle feeding venture itself—within which an individual client's decision to hedge all or none of her cattle would or would not pay off.[8] The

---

**8.** Whether or not a hedging decision pays off obviously depends in part on market forces beyond the promoter's control. That is not the relevant focus of the inquiry in this case, however, for the investor's ability to realize any benefit from the market depends in the first instance on the management of the underlying venture. It is precisely this factor which distinguishes the instant case from cases involving nondiscretionary commodities accounts. *See, e.g., Dubin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 99,144 (S.D. N.Y.1983) (nondiscretionary commodities account not an investment contract); *Gamble v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* Fed. Sec.L.Rep. (CCH) ¶ 99,046 (S.D.N.Y.1982) (same).

In order to satisfy the third prong of the *Howey* test, an investor in a commodities account must establish that she relied solely on the investment advice of the promoter. *See*

*Securities & Exchange Comm'n v. Continental Commodities Corp.,* 497 F.2d 516, 522 (5th Cir. 1974). If the account is not, in fact, discretionary—that is, if the investor has made her own investment decisions—then the profitability of her investment turns not on the managerial efforts of others, but on her own decision and on market forces. *Dubin, supra; Gamble, supra.* The investor is effectively in the same position as one who simply buys a commodity contract directly. *See Noa v. Key Futures, Inc.,* 638 F.2d 77, 79–80 (9th Cir.1980) (agreements to sell silver bars were not investment contracts because once purchase of bars was made, profits to investor turned on fluctuations of silver market and not on managerial efforts of promoter).

In contrast, the fortunes of SCCI's clients did not depend solely on the market once the hedging decision was made. Rather, SCCI's clients depended on SCCI to make all of the managerial

Schultzes testified that SCCI has two types of clients—those who are risk averse and are satisfied with the tax benefits alone and those who are willing to assume risks in the hope of realizing a profit. The fact that some SCCI clients choose to take the risks necessary to realize profits as well as tax benefits does not alter the fact that without the managerial efforts of SCCI, the clients "would invariably be powerless to realize *any* return" on their cattle-feeding ventures—whether that return was in the form of tax benefits or actual profits. Thus, the fact that the plaintiffs chose the riskier course cannot, by itself, transform the essential nature of the underlying contract any more than the fact that an individual investor chooses to buy high-risk junk bonds rather than low-risk AAA bonds causes one bond and not the other to be a security.

Other courts, addressing similar programs, have recognized this distinction. In *Barry v. Ceres Land Co.*, Fed.Sec.L.Rep. (CCH) ¶ 99,008 at 94,745 (D.Minn.1978), the district court concluded after a bench trial that a cattle-feeding program similar to SCCI's was an investment contract. In that case, the investors retained a number of theoretical rights similar to those possessed by SCCI's clients, including the right to terminate their relationship with the promoter,[9] or to demand that their cattle be segregated from those of other investors and moved to another feedyard or sold separately. *Id.* at 94,749. Also like SCCI's clients, the investors in *Barry* were reasonably sophisticated investors, but had no previous experience with cattle feeding. *Id.* at 94,747. Significantly, the investors in *Barry* ignored the advice of their investment adviser to hedge their cattle. *Id.* at 94,748. The investors in *Barry* appeared, moreover, to take a more active role in monitoring their investment than plaintiffs did in this case. *Id.* at 94,748–49.

In applying the third prong of the *Howey* test, the court properly focused not solely on the investors' theoretical power to make decisions, but on their actual capacity to exercise any meaningful control over the care and feeding of their cattle. *Id.* at 94,752. Looking to the underlying venture rather than to the investors' ability to assume a greater risk by not hedging the cattle, the court concluded that the plaintiffs were wholly dependent on the efforts of the defendant for a profit from their venture. *Id.*

The district court in *Barry* therefore recognized implicitly that although the investors' own decision not to hedge their cattle may ultimately have been responsible for the loss the investors incurred, *id.* at 94,-748, the investors nevertheless relied wholly on the managerial efforts of the promoter to make the underlying venture successful. *See also Waterman v. Alta Verde Industries, Inc.*, 643 F.Supp. 797 (E.D.N.C. 1986) (investor in cattle feeding business relied solely on efforts of promoter even though investor made decision to wait to sell cattle).

The Massachusetts Securities Division reached a similar conclusion in evaluating the very plan at issue in this case. While the opinion concludes that the SCCI consulting agreements are securities under Massachusetts law, the Division applied the

---

efforts essential to the functioning of the underlying cattle-feeding venture. In *Noa, supra,* the court expressly distinguished its holding that an agreement to purchase a commodity was not an investment contract from *Glen–Arden Commodities, Inc. v. Costantino,* 493 F.2d 1027 (2d Cir. 1974), in which "the promoters sold whiskey warehouse receipts, but in addition provided their expertise in the selection of whiskey and casks, the finding of a market for whiskey, and the arrangements for ware-housing and insurance." 638 F.2d at 80.

If the underlying venture in this case had been a commodities account, the evidence on which SCCI relies might support a finding that the account was nondiscretionary and therefore not an investment contract. SCCI's role, however, is much more akin to that of the promoter in *Glen–Arden Commodities, supra.* Consequently, the hedging decision must be viewed in the broader context of the cattle-feeding venture as a whole, just as the efforts of individual investors had to be viewed in the context of the elaborate pyramid scheme involved in *Koscot.*

9. Although the consulting agreement did not refer specifically to a client's right to terminate the relationship, the parties do not dispute that plaintiffs could, at least in theory, do so.

*Howey* test in reaching its decision. Blue Sky L.Rep. (CCH) ¶ 31,605, at 26,603–3. We find the Division's reasoning persuasive. In addressing the third prong of the *Howey* test, the Division observed that SCCI's promotional materials clearly conveyed to potential investors that they could rely wholly on the managerial efforts and expertise of SCCI and other third parties—despite the *pro forma* representations that clients would actively manage their own businesses. *Id.* at 26,609. SCCI not only touted the extensive experience of its own personnel, but also assembled for its clients a complete "package" of services—including the arrangement of favorable terms with feedlots and financial institutions. *Id.* The Division concluded that "[i]n light of the fact that [SCCI] provides or makes available all information, expertise and essential parties, the reality is that investors put up money in return for large, current tax benefits without any actual knowledge about or experience in the cattle feeding business." *Id.* at 26,607.

Although the Division did not discuss hedging directly, it properly focused, like the court in *Barry*, on whether SCCI clients had the capacity to perform the functions necessary to manage the underlying cattle-feeding business. In answering that question in the negative, the Division made clear that the clients' formal power to make key management decisions could not obscure the reality that SCCI's clients are entirely dependent on SCCI for the information, expertise and arrangements necessary to make those decisions. The fact that clients, through their hedging decisions, may assume more or less risk does not alter the fact that "Shultz and the other third parties together have primary responsibility for selecting, raising and marketing the cattle, and the Shultz clients lack the capacity to perform these functions." [10] *Id.* at 26,609.

We find that although the district court properly instructed the jury in language paralleling the standard set forth in *Williamson*, there was not sufficient evidence to support a conclusion that plaintiffs did not enroll in the SCCI program with the expectation of profits to come solely from the efforts of others. Despite the formal representations that investors would actively manage their own cattle-feeding businesses, the evidence was undisputed that in reality, SCCI's clients did not have the wherewithal to manage a cattle-feeding business and relied instead on SCCI to make all essential managerial decisions. The only disputed issue which could have provided a basis for the jury's verdict was the hedging decision. However, even construing that evidence in the light most favorable to SCCI, the hedging decision could not, as a matter of law, support the jury's conclusion. *See Boeing*, 411 F.2d at 374. Even if the jury found that plaintiffs voluntarily assumed the risk of hedging only half of their cattle, that evidence could not alter the fact that without the "essential managerial efforts" of SCCI, plaintiffs would have been "powerless to realize *any* return on [their] investment." *Koscot*, 497 F.2d at 485. We conclude that the third prong of the *Howey* test was established as a matter of law.

### B. Common Enterprise

Although we find that the third prong of the *Howey* test—the expectation of profits solely from the efforts of others—is satisfied as a matter of law, the jury's verdict would nevertheless stand if the evidence could support the conclusion that the second prong of the *Howey* test—the existence of a common enterprise—was not met.

■ Plaintiffs urge that evidence regarding the commingling of cattle at the McElhaney feedyard should have been sufficient by itself to establish a common en-

---

**10.** The *Charolais* case, *supra* note 7, on which SCCI relies, is readily distinguished. In *Charolais,* the investor entered into an individual contract with a ranch that did not solicit the investment as part of a larger program. 460 F.Supp. at 231. Moreover, the investor actively managed the business; he visited the ranch fre-

quently and participated in decisions regarding his cattle, made separate arrangements to sell his cattle, purchased additional cattle on his own, and registered his own brand. *Id.* at 229–30. Plaintiffs' involvement in SCCI's cattle-feeding program clearly pales in comparison.

terprise. SCCI, on the other hand, maintains that there can be no common enterprise in this case because SCCI did not in any way share in the fortunes of its clients but merely received a fixed consulting fee.

The courts of appeal are in disagreement regarding the proof necessary to establish the second prong of the *Howey* test.[11] The Third, Sixth, and Seventh Circuits hold that a showing of "horizontal commonality"—a pooling of investors—is necessary to meet the "common enterprise" requirement. *See, e.g., Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 682 F.2d 459, 460 (3d Cir.1982); *Hart v. Pulte Homes of Mich. Corp.,* 735 F.2d 1001, 1004 (6th Cir. 1984); *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274, 276 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). Under this standard, the investors' fortunes must be tied to one another in order to constitute a common enterprise. If, for example, numerous investors subscribe to a program of discretionary investment accounts managed by the same promoter but have individual accounts and do not share profits and losses on a pro rata basis, there is no common enterprise under the horizontal commonality approach. *See Milnarik,* 457 F.2d at 276.

This court, together with the Ninth and Eleventh Circuits, has explicitly rejected the view that horizontal commonality is a prerequisite to establishing a common enterprise within the meaning of *Howey* and has focused instead on the "vertical commonality" between the investors and the promoter. *See, e.g., Koscot,* 497 F.2d at 478–79; *Villeneuve v. Advanced Business Concepts Corp.,* 698 F.2d 1121, 1124 (11th Cir.1983), *aff'd en banc,* 730 F.2d 1403 (11th Cir.1984); *Securities & Exchange Comm'n v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 n. 7 (9th Cir.1973). As we stated in *Koscot,* "[t]he critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's decisions." 497 F.2d at 478.

Although we cited the Ninth Circuit's opinion in *Glenn W. Turner* with approval in *Koscot, id.,* our paths have since diverged in the content that we have given to the term "vertical commonality." The Ninth Circuit imposes a stringent requirement that in order to establish a common enterprise, there must be a direct correlation between the promoter's success or failure and the investors' profits or losses. Under the Ninth Circuit standard, there is no common enterprise if, for example, the promoter receives a flat commission irrespective of whether the investor makes or loses money on the underlying venture. *Brodt v. Bache & Co.,* 595 F.2d 459, 461 (9th Cir.1978).

We have stated, in contrast, that "the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." *Continental Commodities,* 497 F.2d at 522. While our standard requires

---

**11.** The Supreme Court has thus far declined to resolve this split in authority although three justices expressed a desire to do so in a dissent from the denial of certiorari in *Mordaunt v. Incomco,* 469 U.S. 1115, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985), *denying cert. to,* 686 F.2d 815 (9th Cir.1982).

Although some courts have interpreted the Supreme Court's opinion in *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), to require some degree of horizontal commonality, *see, e.g., First National Bank & Trust Co. v. Thoele,* Fed.Sec.L.Rep. (CCH) ¶ 98,854 (W.D.Okla.1982), the dissent from denial of certiorari in *Mordaunt, supra,* indicates that the Court considers the question to be an open one. Commentators agree that *Weaver* should not be construed so broadly. *See, e.g.,* 2 L. Loss & J. Seligman, *Securities Regulation* 928–29 n. 130 (3d ed.1989); Steinberg & Kaulbach, *The Supreme Court and the Definition of "Security": The "Context" Clause, "Investment Contract" Analysis, and Their Ramifications,* 40 Vand.L.Rev. 489, 520 (1987). Addressing only *Weaver*'s narrow holding that a unique agreement, negotiated on a one-on-one basis, is not a security, we find that SCCI's consulting contracts clearly are not the type of unique agreements considered in *Weaver.*

As noted above, SCCI advertised its feeding program broadly. The promotional literature stated that SCCI had over 400 clients in 40 states. Finally, although each client was theoretically involved in an individual cattle-feeding business and signed a separate consulting contract with SCCI, these "one-on-one" consulting contracts were in fact form contracts.

interdependence between the investors and the promoter, it does not define that interdependence narrowly in terms of shared profits or losses. Rather, the necessary interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise even where the promoter receives only a flat fee or commission rather than a share in the profits of the venture.

 SCCI effectively concedes that under this circuit's definition of a common enterprise, a finding that plaintiffs have established the third prong of the *Howey* test will, given the facts of this case, compel a finding that the common enterprise element has been established as well. SCCI nevertheless argues that there is no common enterprise here. SCCI emphasizes that although some of its clients' cattle were in common pens and were not tagged as belonging to an individual client, those clients could still realize different returns on their investment, depending primarily on the price at which each client purchased her feed and how and when the client hedged her cattle.[12] We held in *Continental Commodities*, however, that such variations could not defeat a showing of common enterprise where the investors collectively were dependent upon the promoter's expertise for the success of their investments.

Indeed, the relationship between SCCI and its clients is virtually identical to the relationship between the investors and promoters in *Continental Commodities:*

> Lacking the business acumen possessed by promoters, investors inexorably rely on Continental Commodities' guidance for the success of their investment. This guidance, like the efficacy of Koscot meetings and guidelines on recruiting prospects and consummating a sale, is uniformly extended to all its investors. That it may bear more productive fruits

in the case of some options than it does in cases of others should not vitiate the essential fact that the success of the trading enterprise as a whole and customer investments individually is contingent upon the sagacious investment counseling of Continental Commodities.

497 F.2d at 522–23. For the same reasons that we concluded that the agreement in *Continental Commodities* was a common enterprise, we find it impossible to conclude, even when the evidence is construed in the light most favorable to SCCI, that there was no common enterprise in this case.

We recognize that under our standard the second and third prongs of the *Howey* test may in some cases overlap to a significant degree and that our standard has been criticized for that reason. *See, e.g., Kaplan v. Shapiro,* 655 F.Supp. 336, 340 (S.D. N.Y.1987) (Fifth Circuit standard essentially eliminates the "common enterprise" prong of *Howey* ); *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1237–38 n. 11 (S.D.N.Y.1981) (same); *see also* L. Loss & J. Seligman, *supra* note 8, at 931–35.

As SCCI recognizes, however, this panel is not free to overrule *Koscot* or *Continental Commodities.* Moreover, we are not convinced that it would be desirable to adopt a rigid requirement that profits and losses be shared on a *pro rata* basis among investors, or that the promotor's fortunes correlate directly to the profits and losses of investors. *Howey* sought to establish a standard which would "embod[y] a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299, 66 S.Ct. at 1103. It may be that in declining to adopt the rigid formulae of other circuits, our standard comports more fully

---

**12.** Given this circuit's vertical commonality approach, the commingling of cattle is not, as plaintiffs maintain, sufficient to establish the existence of a common enterprise as a matter of law. It is not, however, entirely irrelevant insofar as this factor belies, to some extent, the "individual" nature of the SCCI consulting con-

tracts. *See supra* note 11. Moreover, in some respects, the commingling of the cattle would produce results similar to a "pooled" investment. When one of the cattle died, for example, the loss was distributed on a pro rata basis among the clients who had an interest in the pen.

with *Howey*'s desire to fulfill the remedial purposes of the federal securities laws.

Here, all of SCCI's clients were dependent on SCCI's expertise to manage their investments. This element is the common thread on which all of the investors' beads were strung. *See Securities and Exchange Comm'n v. Joiner Corp.*, 320 U.S. 344, 348, 64 S.Ct. 120, 122, 88 L.Ed. 88 (1943). Moreover, SCCI's fortunes clearly were interwoven with those of their clients. SCCI received substantial "consulting fees" from its clients in exchange for its services in constructing and administering effective tax shelters through the cattle feeding business. Through the inexorable force of the market, SCCI's success would correspond to that of its clients.

Because there was no evidence presented at trial which would support a finding that SCCI's consulting agreements were not investment contracts, we conclude that the district court erred in failing to grant plaintiffs' motions for a directed verdict or a j.n.o.v.[13] to plaintiffs.

### III.

For the foregoing reasons, the judgment of the district court is REVERSED. Judgment must be entered for appellants with respect to the existence of a security and a new trial held on the issues dependent upon that finding.

---

**13.** Our holding makes it unnecessary for us to address the applicability of the investor/entrepreneur distinction to this case. *See Siebel v. Scott,* 725 F.2d 995, 999 (5th Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823 (1984) (citing *Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982) (applying distinction to sale of business rule)).