**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 27, 2010

No. 09-20734

Lyle W. Cayce
Clerk

AFFCO INVESTMENTS 2001 LLC; AFFCO, LLC; KENNETH KEELING;
LEWIS W. POWERS; JOHN H. POWERS; ALBERT GUNTHER, III;
SHANNON ELLIS; HEIDI GUNTHER; ERIC LINQUEST; GRETCHEN
LINQUEST; LA GIT 88 TRUST; POWERS CHILDREN INTER VIVOS
TRUST; MARTHA GUNTHER,

Plaintiffs - Appellants

v.

PROSKAUER ROSE L.L.P.,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

KING, Circuit Judge:

Plaintiffs-Appellants invested in a complex tax avoidance scheme that was
later investigated and disallowed by the IRS. In the aftermath of the back taxes,
interest, and penalties that ensued, Plaintiffs sued Defendant-Appellee
Proskauer Rose, L.L.P. and sixteen other defendants, asserting claims under the
Racketeering Influenced and Corrupt Organizations Act, the Securities
Exchange Act of 1934, and Texas state law. The district court dismissed the
racketeering claim as barred under the Private Securities Litigation Reform Act

No. 09-20734

and dismissed the securities fraud claims for failure to sufficiently plead the elements of reliance and scienter. For the following reasons, we AFFIRM the district court's judgment.

## I.  BACKGROUND

This case involves a sophisticated income tax avoidance strategy in which taxpayers attempted to claim tax losses through a mechanism of offsetting digital options.[1] Through a limited liability company ("LLC") created solely for the purpose, a taxpayer would use a brokerage firm as a counter-party to buy and sell nearly identical options at approximately the same prices. Having thus hedged against any true losses, the taxpayer would claim a tax basis in the LLC that was increased by the cost of the purchased options, but not reduced by the price received for the options sold. When the LLC later suffered a "loss" (for example, by selling its options for their low fair-market value), the taxpayer would claim a share of that "loss" calculated according to his increased tax basis.[2]

According to the amended complaint, the accounting firm of KPMG, LLP ("KPMG") targeted and solicited Plaintiffs for participation in such a tax scheme, representing the scheme to be a legitimate investment vehicle as well as a legitimate tax shelter through which taxpayers could offset some or all of their

---

[1] Digital options are option contracts in which the purchaser of the option wagers that the price of an underlying commodity, currency, or security will be above or below a certain "strike price" at a particular point in time. A correct wager, or a "win," results in the payout of a predetermined amount, while an incorrect wager, or a "loss," results in the forfeiture of the cost of the option.

[2] This scheme was a variation on a tax avoidance strategy that was heavily marketed and promoted by the financial planning and management industry in the late 1990s. The strategies, which came to be known by names such as BOSS, son-of-BOSS, COBRA, FLIP, BLIP, etc., differed in their particulars; however, each involved creating a high tax basis in a partnership or LLC by executing a series of offsetting transactions. The IRS's subsequent disallowance of these strategies resulted in a number of lawsuits against their developers and promoters.

income.   As part of their marketing strategy, KPMG promised to provide independent opinions from "several major national law firms" that had analyzed and approved the tax strategy.  Plaintiffs allege that the law firm of Proskauer Rose, L.L.P. ("Proskauer") worked with KPMG and other defendants behind the scenes to prepare, in advance, model opinions supporting the validity of the tax scheme.   On the strength of KPMG's assurances, including the promise of opinions from unnamed law firms, Plaintiffs agreed to participate in the scheme. Plaintiffs later received one of these "independent" opinions from the law firm of Sidley Austin Brown & Wood, LLP ("Sidley") to the effect that the tax scheme would likely pass muster with the IRS.

After the necessary transactions had been concluded, but before Plaintiffs filed their tax returns, the IRS issued two separate notices addressing certain types of transactions that the IRS considered to be prohibited.  Concerned about the import of these notices, Plaintiffs sought tax opinions from Proskauer after the issuance of each notice.   Proskauer's opinions essentially concluded that Plaintiffs' transactions were not substantially similar to the prohibited transactions, and that the "losses" generated through the tax scheme were therefore likely allowable.   Consequently, Plaintiffs need not disclose their involvement in the tax scheme on their tax returns.  Proskauer further advised that the Sidley and Proskauer opinions should provide Plaintiffs with a sufficient defense against IRS penalties in the event that Proskauer's opinion proved to be incorrect.

Following Proskauer's advice, Plaintiffs reported the "losses" from the tax scheme on their 2001 income tax returns, but did not report their involvement in the scheme.  The IRS later investigated Plaintiffs for participation in an abusive tax shelter, and Plaintiffs were required to pay millions of dollars in back taxes, interest, and penalties.  Moreover, because they did not report their

involvement in the tax scheme, they were ineligible for the amnesty extended to those taxpayers who had disclosed their participation in such schemes.

Plaintiffs' original complaint named as defendants all of the entities involved in the tax scheme, alleging claims against them under sections 1962 and 1964 of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964; sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a); Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5; and Texas state law. Plaintiffs settled with all defendants save Proskauer, which moved for dismissal of the complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

The district court concluded that Plaintiffs' ownership interests in the LLCs created under the tax scheme were investment contracts, and thus "securities" by definition. The court therefore dismissed the RICO claim under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 77z-1, 78u-4, which bars civil RICO actions based on predicate acts of securities fraud. However, the court gave Plaintiffs leave to replead their securities fraud claim against Proskauer with greater particularity.

Plaintiffs filed an amended complaint re-alleging their federal securities fraud and state law claims. Proskauer moved to dismiss all claims save for the professional malpractice claim. The district court granted the motion, dismissing the section 10(b) claim for failure to sufficiently plead the elements of reliance and scienter, and declining to exercise supplemental jurisdiction over the related state law claims. This appeal followed.

## II.  DISCUSSION

We review a Rule12(b)(6) dismissal *de novo*, assuming all well-pleaded, nonconclusory factual allegations in the complaint to be true. *See Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949–50 (2009); *Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383, 386 (5th Cir. 2008).

No. 09-20734

## A.   The RICO Claim[3]

Plaintiffs allege that the defendants named in its original complaint formed an "enterprise," the common purpose of which was to solicit wealthy taxpayers to participate in the tax scheme, convince those taxpayers that the scheme was a legitimate tax shelter, and implement the scheme on behalf of those taxpayers, all in order to collect substantial fees. Plaintiffs further allege that the defendants engaged in a "pattern of racketeering activity" by committing numerous acts of wire and mail fraud in furtherance of their enterprise.

RICO provides a private right of action for persons harmed by a pattern of racketeering activity. 18 U.S.C. §§ 1962, 1964(c). However, Congress limited this right by amending RICO in 1995, as part of the PSLRA, to bar civil RICO claims based on "any conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). Plaintiffs argue that the district court incorrectly applied this PSLRA bar to their civil RICO claim because neither their ownership interests in the LLCs, nor the digital option contracts themselves, constituted "securities" as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. Because we find that Plaintiffs' ownership interests in the LLCs constituted "investments contracts," and therefore were "securities" within the meaning of the federal securities laws, we affirm the district court without reaching the question of whether the digital options that Plaintiffs bought and sold also were securities.

Both the 1933 and 1934 Acts broadly define the term "security" to include, among other things, an "investment contract." *See* 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). In *SEC v. W. J. Howey, Co.*, the Supreme Court defined an

---

[3] We review the dismissal of the RICO claim based on the facts alleged in the original complaint, and the dismissal of the securities fraud claims based on the facts alleged in the amended complaint.

investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." 328 U.S. 293, 298–99 (1946). The *Howey* test thus contains three elements: (1) an investment of money; (2) in a scheme functioning as a common enterprise; (3) with the expectation that profits will be derived solely from the efforts of individuals other than the investors. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 477 (5th Cir. 1974) (citations omitted); *accord Williamson v. Tucker*, 645 F.2d 404, 417–18 (5th Cir. 1981) (citing *Koscot*, 497 F.2d 473). With respect to Plaintiffs' interests in the LLCs, the only issue raised on appeal is whether the profits—here, the tax benefits—were to come solely from the efforts of those other than Plaintiffs.[4]

We are not without guidance in deciding this question. In *SEC v. Koscot Interplanetary, Inc.*, we examined a pyramid promotion scheme involving the sale of cosmetics. Notwithstanding the efforts of the individual investors, who actually sold the products and recruited new investors, we found the scheme to be an investment contract because the promoters of the scheme retained immediate control over the essential managerial conduct of the enterprise, and because the investors' realization of profits was inextricably tied to the success of the promotional scheme. 497 F.2d at 485. In so doing, we held that the proper standard for analyzing the third prong of the *Howey* test is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id*. at 483 (quoting and adopting the standard explicated by the Ninth Circuit in *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)) (internal quotation marks omitted).

---

[4] Tax benefits may constitute an expectation of "profits" under the *Howey* test. *See Long v. Shultz Cattle Co.*, 881 F.2d 129, 132–33 n.2 (5th Cir.1989) (citations omitted).

Our decision not to literally construe the "solely from the efforts of others" test is consistent with the Supreme Court's emphasis on the principle that "economic reality is to govern over form." *See Williamson*, 645 F.2d at 418 (citations omitted). Since *Koscot*, we have examined a variety of situations in which investors retained substantial theoretical control, but in fact remained passive. In *Williamson*, we held that an investor's theoretical power to make managerial decisions did not automatically preclude a finding that the investor relied solely on the efforts of others. Rather, in accordance with the principle that substance is to govern over form, we held that even where an investor formally possesses substantial powers, the third prong of the *Howey* test may be met if the investor demonstrates that he is "so inexperienced and unknowledgeable" in the underlying nature of the investment that he is "incapable of intelligently exercising" his formal rights. *Id.* at 424.

We applied this standard in *Long v. Shultz Cattle Co.*, 881 F.2d 129 (5th Cir. 1989), where we examined a cattle-feeding consulting agreement designed to achieve advantageous tax write-offs for investors. Although the investors had the formal authority to make such management decisions as the purchase of cattle, the choice of a feed yard, and when and to whom to sell, they were not cattlemen and did not have the wherewithal to manage a cattle-feeding business. They therefore relied solely upon the advice and managerial efforts of a third party in "authorizing" all such decisions. *See id.* at 134–35. Given the economic reality of the situation, we held that the expected profits came solely from the efforts of others.

Plaintiffs' ownership interests in the LLCs are similar to the consulting agreements held to be investment contracts in *Long*. The original complaint describes the formation, funding, and trading activities of four LLCs: three single-member LLCs, capitalized by three separate named Plaintiffs, and a fourth LLC that was capitalized in part by a fourth Plaintiff, an investment

entity, which in turn was largely owned by other named Plaintiffs. Plaintiffs argue that, based on these facts, they retained control over the LLCs.

However, Plaintiffs' control was theoretical rather than actual. Plaintiffs do not plead that they exercised any managerial authority over the LLCs; rather, the original complaint states that, under the terms of the investment contracts, the LLCs were to be "under the direction of," and "managed by," various investment consulting and brokerage entities for the purpose of implementing the tax scheme. As expressly pled in the original complaint, Plaintiffs were unaware that the underlying digital options transactions had little or no true economic substance. Plaintiffs thus portrayed themselves as passive investors who depended—both in reality and according to their investment contracts—upon the efforts of others for their profits. The district court did not err in assuming these facts to be true, as it must under Rule 12(b)(6), and dismissing the RICO claim as barred by the PSLRA on the face of the pleadings.

## B.    The Securities Fraud Claim[5]

In the alternative to their RICO claim, Plaintiffs allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a).[6]

Section 10(b) makes it unlawful

---

[5] Plaintiffs argue that it was inherently contradictory for the district court to bar their RICO claim on the ground that the predicate acts were actionable as securities fraud, and then dismiss their securities claims for failure to state a cause of action. However, there is nothing inconsistent about the district court's decisions. Simply because a fraudulent scheme is found to involve the purchase or sale of securities, and therefore "actionable as securities fraud," does not mean that Plaintiffs are exempted from the pleading requirements for securities fraud claims.

[6] Plaintiffs have failed to brief and develop their assertion that Proskauer is liable as a "controlling person" under § 20(a) for the fraudulent acts of the other defendants, and have therefore waived that argument. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument." (citations omitted)).

No. 09-20734

for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful

for any person, directly or indirectly . . .

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.

The Supreme Court has found an implied private cause of action in section 10(b) and its implementing regulation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971)). To state a private claim under section 10(b), a plaintiff must prove:

(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Id.* (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

No. 09-20734

The district court held that Plaintiffs failed to sufficiently plead the elements of reliance and scienter. We agree that Plaintiffs failed to show reliance on Proskauer. Without direct attribution to Proskauer of its role in the tax scheme, reliance on Proskauer's participation in the scheme is too indirect for liability. We therefore do not reach the issue of scienter.

We begin our discussion of relevant case law with the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). *Central Bank* involved the issuance of bonds by a public building authority. Central Bank of Denver, the indenture trustee for the bond issues, had reason to suspect that the appraisal of the real estate securing the bonds may have been inflated. The plaintiffs alleged that the bank aided and abetted the issuer in committing securities fraud by agreeing to delay an independent appraisal of the real estate until after the closing on the bond issue. *Id.* at 167–68.

After reviewing the text and history of section 10(b), the Court concluded that a private plaintiff may not maintain an aiding and abetting suit under section 10(b). To hold otherwise, explained the Court, would "impose . . . liability when at least one element critical for recovery under 10b-5 is absent: reliance." *Id.* at 180 (citing *Basic Inc. v. Levinson*, 485 U.S. 244, 243 (1988)). Nevertheless, the Court acknowledged that private plaintiffs could still hold "secondary actors" liable for fraudulent conduct under certain circumstances:

> Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.

*Id.* at 191 (citation omitted).

The Supreme Court has not directly addressed the question we answer in this case—whether a secondary actor can be held liable in a private section 10(b)

action for deceptive conduct not attributed to it before an investor decides to invest. However, the Court's recent decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.* is instructive.

In *Stoneridge*, investors alleging losses after purchasing common stock sought to impose liability on entities that had agreed to sham purchase and sale contracts with the issuing corporation. These transactions fooled the corporation's auditor, thus allowing the corporation to publish a misleading financial statement affecting the share price. The Court granted certiorari to resolve a conflict between the courts of appeals as to "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)." 552 U.S. at 156 (citing *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006); *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007)).

Invoking a theory that some courts have called "scheme liability," the plaintiff in *Stoneridge* contended that liability was appropriate even absent a public statement or duty to disclose because the third-party entities "engaged in conduct with the purpose and effect of creating a false appearance of material fact to further a [fraudulent] scheme." *Id.* at 159-60. The Court rejected that theory, stating that the plaintiff's view of primary liability

> makes any aider and abettor liable under § 10(b) if he or she committed a deceptive act in the process of providing assistance. Were we to adopt this construction of § 10(b), it would revive in substance the implied cause of action against all aiders and abettors except those who committed no deceptive act in the process of facilitating the fraud; and we would undermine Congress' determination that this class of defendant should be pursued by the SEC and not by private litigants.

*Id.* at 162–63 (citations omitted). The Court premised its holding upon its view that the "scheme liability" theory failed to answer the objection that the plaintiff

"did not *in fact* rely upon respondents' *own* deceptive conduct." *Id.* at 160 (emphases added). Because "[n]o member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times," the Court held that the plaintiff "cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability." *Id.* at 159.

Plaintiffs effectively adopt this "scheme liability" theory in urging us to hold that a defendant can be liable for participating in the creation of a false statement or misrepresentation that investors rely upon, regardless of whether that statement is attributed to that defendant at the time of dissemination. The causal chain between Proskauer's conduct and Plaintiffs' injury is admittedly shorter than in *Stoneridge*. However, Plaintiffs bear a heavy burden in showing that they in fact relied upon Proskauer's own deceptive conduct. The Supreme Court's focus on reliance in *Stoneridge* favors a rule that preserves the robustness of that element in private securities actions. *See id.* ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability.") (quoting *Basic*, 485 U.S. at 243). Furthermore, *Stoneridge* appears to imply that a secondary actor's conduct or statement must be known to the investor in order for the investor to rely upon it. *See id.*

We therefore conclude that explicit attribution is required to show reliance under section 10(b). We find persuasive the reasoning of the Second Circuit in *Pacific Investment Management Co. v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010). In *Pacific Investment*, the court addressed two questions about the scope of federal securities laws: (1) whether, under section 10(b) and Rule 10b-5, a corporation's outside counsel could be liable for false statements that those

attorneys allegedly created, but which were not attributed to the law firm or its attorneys at the time the statements were made; and (2) whether plaintiffs' claim that outside counsel participated in a scheme to defraud investors was precluded by the Supreme Court's decision in *Stoneridge. Id.* at 148. The court held that a "secondary actor"—such as a lawyer, accountant, or bank not employed by the firm whose securities are at issue—can be held liable in a private section 10(b) action only for false statements attributed to that secondary actor at the time of dissemination. *Id.* & n.1. "Absent attribution, plaintiffs cannot show that they relied on defendants' *own* false statements, and participation in the creation of those statements amounts, at most, to aiding and abetting securities fraud." *Id.* at 148.

Knowing the identity of the speaker is essential to show reliance because a word of assurance is only as good as its giver. Clients engage "name-brand" law firms at premium prices because of the security that comes from the general reputations of such firms for giving sound advice, or for winning trials. Specific attribution to a reputable source also induces reliance because of the ability to hold such a party responsible should things go awry. As Plaintiffs themselves allege in their amended complaint:

> To convince skeptical taxpayers that the strategies were legitimate, the investment consultants needed to offer more than their own self-interested assurances. They needed lawyers to provide 'independent' legal opinions supporting the tax strategies. And not just any lawyers would do. The complexity of the strategies and the technical nature of income-tax rules made it imperative that promoters provide taxpayers with formal tax opinions from reputable national law firms. Taxpayers wanted solid assurance that the deals had been reviewed and approved by attorneys from prominent national law firms with reputations as authorities on tax law.

KPMG's advertisement of support from "major national law firms" makes this a closer case than if KPMG had not so characterized the sources of the tax

opinions.   However, KPMG's representation still falls short of showing that Plaintiffs relied on Proskauer itself.   Borrowing from the language of the Second Circuit:

> Attribution is necessary to show reliance.  Where statements are publicly attributed to a well-known national law or accounting firm, buyers and sellers of securities (and the market generally) are more likely to credit the accuracy of those statements.  Because of the firm's imprimatur, individuals may be comforted by the supposedly impartial assessment and, accordingly, be induced to purchase a particular security.   Without explicit attribution to the firm, however, reliance on that firm's participation can only be shown through 'an indirect chain . . . too remote for liability.'

*Id*. at 156 (quoting *Stoneridge*, 552 U.S. at 159).

Applying this standard here, we conclude that the district court properly dismissed Plaintiffs' securities fraud claims against Proskauer.  The amended complaint alleges that "law firms (such as Proskauer Rose and Sidley Austin Brown & Wood) . . . [worked with other defendants] to promote, sell, and support the tax strategies on a broad scale"; that the promoters' "associations with Proskauer, Sidley, and others allowed [them] to offer skeptical taxpayers the assurance that the strategies had been reviewed and approved in 'independent' tax opinions from several major national law firms"; that a partner at Proskauer worked with other defendants to refine the tax strategies, review the marketing materials, and create model template opinions addressing the tax consequences and reporting requirements of the tax transactions; that the strategy contemplated that the taxpayer would receive one or more of these opinions from his choice of four firms, including Proskauer; that Plaintiffs were assured that "several major national law firms had also vetted the [tax scheme] and could provide Plaintiffs [with] an 'independent' opinion corroborating KPMG's representations"; and that, based in part on "the assurance that national law

firms such as Proskauer and Sidley were prepared to provide opinions supporting the [tax scheme], Plaintiffs agreed to the deal."

While these allegations paint a clear picture of Proskauer's intimate involvement in the tax scheme, Plaintiffs scrupulously avoid any explicit assertion that they had knowledge of Proskauer's role prior to their actual investment in the tax scheme.  They do not allege that they ever saw or heard any Proskauer work product before making their decision, nor do they explicitly allege that the promoters specifically identified Proskauer as one of the "major national law firms" that had vetted and cleared the tax scheme or that had agreed to provide opinions supporting the same.  In short, Plaintiffs do not allege that they knew of Proskauer's role in the tax scheme during the relevant time period when they were making their investment decisions.[7]  In the absence of any such attribution to Proskauer, we find that Plaintiffs have failed to show reliance on Proskauer.

As the Supreme Court has explained, securities law is "an area that demands certainty and predictability." *Central Bank*, 511 U.S. at 188 (quoting *Pinter v. Dahl*, 486 U.S. 622, 652 (1988)) (internal quotation marks omitted). The attribution requirement that we adopt today makes clear the boundary between primary violators—who are open to liability in private securities actions—and aiders and abettors, to whom the private right of action under section 10(b) does not extend.[8]

---

[7] Proskauer's explicit involvement in the scheme—the two tax opinions regarding the IRS reporting requirements—were rendered well after the purchase of the digital options and the creation of Plaintiffs' interests in the LLCs.  They therefore cannot form the basis for liability under Rule 10b-5, as Plaintiffs cannot demonstrate "a connection between the misrepresentation or omission and the purchase or sale of a security." *Stoneridge*, 552 U.S. at 157.

[8] The Fourth Circuit has also considered the attribution question post-*Stoneridge*.  In *In re Mutual Funds Investment Litigation*, 566 F.3d 111 (4th Cir. 2009), *cert. granted*, *Janus Capital Group, Inc. v. First Derivative Traders*, 130 S. Ct. 3499 (2010), the court held that

No. 09-20734

## III.  CONCLUSION

For the reasons stated above, the judgment of the district court is AFFIRMED.

---

> a plaintiff seeking to rely on the fraud-on-the-market presumption must ultimately prove that interested investors (and therefore the market at large) *would* attribute the allegedly misleading statement to the defendant.  At the complaint stage a plaintiff can plead fraud-on-the-market reliance by alleging facts from which a court could plausibly infer that interested investors *would have known* that the defendant was responsible for the statement at the time it was made, even if the statement on its face is not directly attributed to the defendant.

*Id.* at 124 (citations omitted) (emphases added).

The court explicitly cabined its holding to the "limited context of fraud-on-the-market," declining to "establish an attribution standard for all reliance inquiries."  *Id.* at 123. Our case is not a fraud-on-the-market case.  Although we have some concern about whether the Fourth Circuit's standard comports with the Supreme Court's stated goals of "certainty and predictability" in securities law and, accordingly, whether we would adopt that standard for the fraud-on-the-market context, we need not decide that today.